1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10
11                                                CASE NO. 5:23-cv-01541-JLS-SP

12
13   NAOMI ESTRADA-MENDOZA, NOEL
     CHRISTINE ESTRADA-LOUD,
14   JUVENTINO MENDOZA, and AMBROSE          **FINDINGS OF FACT AND**
     MENDOZA,                                **CONCLUSIONS OF LAW AFTER**
15                                           **BENCH TRIAL**

16              Plaintiffs,

17   v.

18   LOMA LINDA UNIVERSITY HEALTH
19   and UNITED STATES OF AMERICA,

20              Defendants.

21
22
23
24
25
26
27
28

1

**I.    INTRODUCTION**

Plaintiffs Naomi Estrada-Mendoza, Noel Christine Estrada-Loud, Juventino Mendoza, and Ambrose Mendoza filed this action following the death of Tinosvaldo Mendoza at Defendant United States of America's Loma Linda Veteran Affairs Medical Center.  Plaintiffs bring this action for medical malpractice and wrongful death under the Federal Tort Claims Act ("FTCA").

The Court held a five-day bench trial from August 25 to August 29, 2025. Thereafter, the parties filed Proposed Findings of Fact and Conclusions of Law, as well as Responses to the opposing party's Findings of Fact and Conclusions of Law.  (Pltf. FOFCOL, Doc. 138; Def. FOFCOL, Doc. 134; Pltf. Response, Doc. 140; Def. Response, Doc. 139.)  Having considered the testimony of all 18 witnesses, all admitted exhibits, the parties' arguments at trial, and the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure Rule 52.[1]

**II.    FINDINGS OF FACT**

**A. The Surgery**

1. On February 22, 2021, Tinosvaldo Mendoza (the "Decedent") underwent a robotic assisted right radical tonsillectomy, a left tonsillectomy, and a right modified radical neck dissection at Loma Linda Veteran Affairs Medical Center (the "Hospital") in Loma Linda, California.  (Admitted Fact at 3–4, Doc. 101.)

2. Dr. De Andrade Filho, Chief of Otolaryngology at the Hospital, performed the surgery.  (Trial Transcript Day 2, T2 at 113:23–24, 119:15–16, Doc. 129.)

3. Surgical notes from February 22, 2021 reflect that the surgery had no complications.  (Admitted Fact at 4.)

---

[1] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact.  To the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

4. Decedent was to remain at the Hospital for five days following his surgery, so that the staff could monitor any possible bleeding due to the radical tonsillectomy.  (T2 at 145:2–16.)  Bleeding is considered a foreseeable complication of a radical tonsillectomy.  (*Id.*)

5. For monitoring, Decedent was assigned to a step-down unit of the Hospital.  (*Id.* at 77:6–9.)  At the Hospital, post-surgery patients are placed in step-down units if they need to be monitored more closely than other patients for whom post-surgery complications are less anticipated.  (*Id.* at 77:16–25, 78:1–6.)  All patients in step-down units have call buttons next to their beds.  (*Id.* at 78:19–22.)

6. While in the step-down unit after surgery, Decedent was given pain medication.  (Trial Transcript Day 4, T4 at 14:14–25, 15:1–15, Doc. 131.)  Decedent also was given access to a Yankauer suction device at his bedside so that he could suction excess saliva from around his mouth.  (T2 at 164:21–25.)  Dr. Filho instructed Decedent to not use the Yankauer tube past his lips, and he observed Decedent using the Yankauer tube properly.  (*Id.* at 165:5–25, 166:1–10.)

**B. Decedent's Bleeding and the Response**

7. On February 25, 2021, nurses' notes indicate that 12:00 a.m., 1:00 a.m., 2:00 a.m., 3:00 a.m., and 4:00 a.m., Decedent was "lying in bed resting, no distress noted, call light within reach."  (Admitted Fact at 4.)  At 4:30 a.m. on February 25, Nurse Luis Palacios checked on Decedent and changed his IV.  (T4 at 14:6–13.)  Nurse Palacios is a registered nurse at the Hospital.  (*Id.* at 9:21–23.)

8. On February 25, 2021, at approximately 4:55 a.m., Decedent pressed his call button requesting aid.  (Admitted Fact at 4.)

9. The resource nurse answered the call button.  (T4 at 16:2–11.)  The resource nurse then yelled out to Nurse Palacios, telling him that his patient was bleeding.  (*Id.* at 16:17–22.)

10. When Nurse Palacios walked into Decedent's room, he saw Decedent bleeding profusely from the mouth and coughing up blood, such that he appeared to be

throwing up blood. (*Id.* at 17:1–5.) Decedent was also sitting up and using the Yankauer device to suction blood from his mouth. (*Id.* at 17:3–8.)

11. Nurse Palacios raised Decedent's bed to a 90-degree angle and leaned Decedent forward, then took the Yankauer device from him and continued to suction blood from Decedent's mouth. (*Id.* at 17:6–13.)

12. When Nurse Palacios noticed the bleeding wasn't stopping, he laid Decedent flat and turned him to his side. (*Id.* at 28:14–19.)

13. Nurse Palacios testified that he was "hoping that [the bleeding] would just stop." (*Id.* at 25:24.)

14. Nurse Palacios asked the resource nurse to call a for a Rapid Response Team ("RRT"). (*Id.* at 17:15–21.) The resource nurse then walked out and told the charge nurse to call a Rapid Response. (*Id.*) An RRT at the Hospital generally consists of a nurse, a respiratory therapist, and a doctor in charge of the patient. (Trial Transcript Day 3, T3 at 127:3–6, Doc. 130.)

15. The RRT was called at around 5:00 a.m. (*Id.* at 133:20–24.)

16. While awaiting the RRT, the Nurse Palacios and the resource nurse used towels to clean blood from Decedent's gown and bed, so that the large amount of blood coming from Decedent's mouth would not collect on the floor. (T4 at 20:13–24.)

17. Nurse Palacios also continued to suction blood from Decedent using the Yankauer device. (*Id.* at 23:14–16.) Nurse Palacios was also feeling Decedent's pulse. (*Id.* at 23:10–16.)

18. Nurse Palacios felt Decedent's pulse getting "thready," so he called a Code Blue. (*Id.* at 23:17–25, 24:1–10.) The resource nurse then pushed the Code Blue button, (*id.* at 29:16–17), which alerted the floor to the Code Blue. (T3 at 125:19–25, 126:1–5.)

19. Shortly after, Nurse Palacios no longer felt a pulse from Decedent. (T4 at 26:1–8.) Nurse Palacios then laid Decedent on his back and initiated chest compressions (CPR). (*Id.*)

20. At around 5:02 a.m., the RRT nurse arrived and saw CPR in progress. (Admitted Fact at 4; T3 at 133:24–25, 134:1–5.)  Other medical staff then arrived and took over administering CPR to Decedent.  (T4 at 27:10–17.)

21. They also put an Ambu bag over Decedent's nose and mouth to attempt to oxygenate him.  (T2 at 172:3–9.)  An Ambu bag is a mask attached to a "balloon" of air, which is squeezed, pressing air through the mask.  (*Id.* at 171:22–24.)

22. There was substantial resistance every time the staff squeezed the Ambu bag: the bag would emit a "farting sound," indicating difficulty in oxygenating Decedent.  (T4 at 28:1–7.)

23. Decedent became unconscious and never recovered consciousness.  (Admitted Fact at 5.)

**C. The Response to the Code Blue**

24. A Code Blue team, including a critical care resident, arrived at approximately 5:03 a.m.  (Admitted Fact at 5.)  An emergency code cart also arrived.  (T4 at 27:7–8.)

25. Dr. Kenneth Wys, an anesthesiologist and intensivist, arrived at approximately 5:05 a.m.  (Admitted Fact at 5.)  Dr. Wys observed copious amounts of blood coming from Decedent's mouth such that there was blood "in various places in the room."  (T2 at 171:4–11.)

26. Dr. Wys observed attempts to ventilate Decedent with the Ambu bag and an oral airway.  (*Id.* at 172:8–9.)  Dr. Wys testified that the Ambu bag did not appear to working, and that it was clear that it would not be a successful long-term solution.  (*Id.* at 172:10–14, 175:8–12.)  He further testified that the Ambu bag was pushing both blood and air into Decedent's lungs.  (*Id.* at 172:17–18.)

27. Dr. Wys testified that as the most senior person in the room, he could lead the Code Blue or assist the ongoing efforts by the medical staff.  (*Id.* at 173:6–17.)  He elected to support the respiratory therapist and allow the resident to lead the Code Blue.  (*Id.*)

28. Dr. Wys and the respiratory team continued to perform CPR and administer the Ambu bag with the oral airway. (*Id.* at 175:17–25, 176:1–25, 177:1–4.)

29. During the pauses in between rounds of CPR, Dr. Wys used a laryngoscope and a glidescope to look into the back of Decedent's throat. (*Id.* at 176:6–9, 177:13–25, 178:1–8.)  A laryngoscope is a handle with a flashlight on the end, and a glideslope has a camera attached. (*Id.* at 176:6–9, 178:3.)  Dr. Wys saw only a pool of blood with both instruments. (*Id.* at 177:18–19.)

30. Tracheotomies and cricothyrotomies are both procedures used to establish a surgical airway for a patient. (*Id.* at 178:23–25, 179:1–9.)  However, the emergency crash cart did not have any instruments that could be used to perform a surgical airway. (Admitted Fact at 5.)

31. Dr. Wys asked if instruments were available to perform a surgical airway. (T2 at 178:9–14; Admitted Fact at 5.)  Dr. Wys testified that he cannot remember exactly when he asked the question, but that he would have asked it when he was near the bottom of the ASA Algorithm for Difficult Airways, which is a "decision tree" for anesthesiologists to follow when they are presented with difficult airways. (T2 at 180:22–25, 181:1–10, 204:23–25, 205:1–9.)  Dr. Wys testified that he was then told that surgical airway instruments were not readily available. (*Id.* at 178:12–14.)

32. Dr. Wys did not attempt a blind intubation. (*Id.* at 191:2–8.)  A blind intubation involves placing a tube into the patient's trachea in order to oxygenate the patient, without being able to visualize the trachea. (*Id.* at 36:13–25, 37:1–9.)

33. Dr. Wys testified that the risk of attempting a blind intubation was very high, because without a visualization of Decedent's airway, he could have hit his vocal cords, disrupted his surgical field, or ripped open his incisions. (*Id.* at 191:10–19.)  Dr. Wys further testified that the likelihood of success of the blind intubation was "essentially nothing" because Decedent's airway was a "dark hole" which, following surgery, "would have swollen, shifted directions." (*Id.* at 191:2–8, 24.)

6

34. Around 17 minutes after Dr. Wys arrived, Decedent had had no cardiac activity, and Dr. Wys decided to stop the Code Blue.  (*Id.* at 178:23–25, 179:1–2.)  At 5:22 a.m., Decedent was pronounced dead.  (Admitted Fact at 5.)

35. Decedent was 45 years old when he died.  (*Id.* at 3.)

**D. Witness Testimony: Standard of Medical Care**

      i.   <u>Plaintiffs' Expert Dr. Darwish</u>

36. Dr. Omar Darwish is a hospitalist at UC Irvine Medical Center.  (T2 at 4:12–21.)  He reviewed the medical record, the hospitalization record, the autopsy report, and the depositions of Dr. Wys and Dr. Filho, the doctors involved in treating Decedent, to prepare his opinions in this case.  (*Id.* at 9:2–13.)

37. Dr. Darwish opined that Decedent died because he bled from the surgical area—his throat—and choked on his own blood, resulting in his heart stopping due to a lack of oxygen.  (*Id.* at 12:21–25, 13:1.)

38. Dr. Darwish stated that the most likely cause of Decedent's bleeding was that the Yankauer tube was used in a way that disrupted the sutures in Decedent's throat.  (*Id.* at 15:14–23.)  Dr. Darwish gave no opinion as to whether it was below the standard of care to give Decedent access to the Yankauer tube.  (*Id.* at 53:11–15.)

39. Dr. Darwish testified that given the amount of blood coming from Decedent's mouth, the Code Blue was not called in a timely manner.  (*Id.* at 19:19–23.)  Specifically, he testified that as soon as the resource nurse saw blood profusely coming from Decedent's mouth, he should have immediately called a Code Blue, so that a doctor would arrive to perform a surgical airway.  (*Id.* at 19:25, 20:1–25, 21:1–22, 28:5–10.)

40. Dr. Darwish explained that a resource nurse is typically more qualified than other nurses.  (*Id.* at 18:7–9.)  Dr. Darwish therefore stated that a reasonable resource nurse should have understood that an airway needed to be secured, after seeing Decedent bleeding profusely from the mouth, and immediately called a Code Blue.  (*Id.* at 52:3–7.)

7

41. Dr. Darwish further explained that immediately calling a Code Blue, rather than a Rapid Response, was necessary to meet the standard of care because a Code Blue team would include a doctor who is able to secure an airway. (*Id.* at 20:1–14, 52:3–7.)

42. However, Dr. Darwish stated that attempts to establish an airway during the Code Blue fell below the standard of care. (*Id.* at 34:7–10.)

43. Dr. Darwish opined that there is "no excuse" for failure to have a surgical airway kit available. (*Id.* at 29:22–25, 30:1.) Although Dr. Darwish explained that surgical airway kits are not found on every floor of a hospital, they should be in every ER and ICU, such that a surgical airway kit may be retrieved within minutes if it is not on the same floor as the patient. (*Id.* at 31:6–25.) Dr. Darwish further opined that in this case, because Decedent was in a step-down unit with a higher level of care, and because he had just had a radical tonsillectomy, the surgical airway kit should have been within reach. (*Id.* at 33:8–25.)

44. Dr. Darwish further testified that there was "no excuse" for Dr. Wys not attempting a blind intubation. (*Id.* at 36:10–12.) Dr. Darwish recognized that because the procedure is blind, it is possible to put the tube into the patient's esophagus or cause further trauma. (*Id.* at 36:22–25, 39:1–6.) However, he stated that in this situation, "you have no alternative." (*Id.* at 39:6.)

45. Dr. Darwish stated that three minutes after a patient loses his pulse, there is a risk of permanent brain damage. (*Id.* at 60:20–23.) However, he further testified that a reasonable doctor responding to a Code Blue would certainly administer aid after three minutes has passed, because there is still a window of opportunity during which the medical staff need to act quickly. (*Id.* at 70:1–25.)

46. Dr. Darwish testified that because Decedent was 45 years old with a healthy heart, "you would assume that he's able to recover from such an event" if the proper care was promptly administered. (*Id.* at 73:1–8.)

8

47. Dr. Darwish testified that if the medical staff had met the standard of care in all respects from the moment Decedent pressed his call button, Decedent, more likely than not, would have survived.  (*Id.* at 41:16–19.)

48. The Court found Dr. Darwish's testimony and opinions credible and reasonably supported, as they were based on his experience as a hospitalist and knowledge of the field, and review of Decedent's records.  Dr. Darwish provided detailed explanations of the reasons for his opinions—for example, he stated that a Code Blue should have been called particularly because a resource nurse was more qualified, and he opined that a surgical airway kit should have been retrieved because they are available on specific floors—bolstering his credibility.  The Court also found that Dr. Darwish's opinions stayed consistent throughout direct and cross-examination.

ii.  Plaintiffs' Expert Dr. Mandoff

49. Dr. Victor Mandoff is an anesthesiologist at the University of Arkansas.  (T3 at 4:13.)  Dr. Mandoff is board certified in anesthesiology, and was previously board certified as a critical care expert until 2016, when he decided to concentrate on anesthesiology.  (*Id.* at 7:15–25, 8:1–6.)  Dr. Mandoff reviewed various documents before preparing an opinion in this case.  (*Id.* at 2:6–16.)

50. Dr. Mandoff testified that Decedent died due to "hypoxemia due to asphyxiation," meaning that Decedent's airway filled up with blood such that he could not breathe.  (*Id.* at 21:13–21.)

51. In Dr. Mandoff's opinion, the bleeding from Decedent's throat was likely caused by the sutures in his throat being disrupted by his use of the Yankauer tube.  (*Id.* at 45:5–10.)  Dr. Mandoff opined that it "doesn't seem like a good idea" to give sleep-deprived patients on narcotics, like Decedent, access to a Yankauer tube.  (*Id.* at 61:14–18.)

52. Dr. Mandoff testified that, as described in the hospital notes, the state in which the nurse found Decedent, with copious amounts of blood coming from his

mouth, was a "dire emergency." (*Id.* at 18:17–20.) Thus, the nurses should have immediately called a Code Blue. (*Id.*)

53. Dr. Mandoff stated that during the Code Blue, using an Ambu bag for a limited time is reasonable. (*Id.* at 24:23–25.) However, he opined that after a few breaths, because there was a big pool of blood in the back of Decedent's throat, and because there was substantial resistance, it should have been obvious the Ambu bag was not working. (*Id.* at 24:1–9.) He stated that it was below the standard of care to continue Ambu bagging because it was taking time away from concentrating on successfully securing an airway. (*Id.* at 24:16–22, 25:1–5.)

54. Dr. Mandoff testified that because this was a dire emergency, if intubation was not an option, a surgical airway was needed to save the patient's life. (*Id.* at 27:14–17.)

55. Dr. Mandoff stated that the equipment needed to obtain an emergency surgical airway should have been readily available. (*Id.* at 33:13–20, 34:3–7.) Dr. Mandoff specifically stated that if the surgical airway kit was not already at bedside, someone at the Code Blue should have run to a different part of the hospital to obtain the equipment within a couple of minutes. (*Id.* at 27:18–25, 28:1–5, 42:21–25, 43:1–2.)

56. Dr. Mandoff testified that someone should have alternatively attempted to intubate Decedent using an endotracheal tube. (*Id.* at 26:25, 27:1–2.) Dr. Mandoff recognized that it is not easy to perform a blind intubation. (*Id.* at 27:3.) However, Dr. Mandoff still testified that a doctor can use the patient's anatomy—specifically, the feeding tube behind the trachea—to guide the endotracheal tube down the patient's trachea. (*Id.* at 36:19–25, 37:1–13.)

57. Dr. Mandoff stated that it fell below the standard of care to not have attempted to secure a definitive airway, either surgically or through blind intubation. (*Id.* at 38:20–25.)

10

58. Dr. Mandoff stated that if the proper equipment had been on hand, Decedent's chance of survival would have been very good because Decedent was a relatively healthy 45-year-old whose heart and lungs were working well. (*Id.* at 35:16–23.)

59. The Court found Dr. Mandoff's testimony and opinions credible and reasonably supported, as they were based on his experience as an anesthesiologist and knowledge of the field, and review of Decedent's records. Dr. Mandoff recognized the nuances of the situation, conceding that using the Ambu bag was reasonable for a short period of time, and that it would not be easy to perform a blind intubation, bolstering his credibility. The Court also found that Dr. Mandoff's opinions stayed consistent throughout direct and cross-examination.

### iii. Defendant's Expert: Dr. Goldsztein

60. Dr. Hernan Goldsztein is chief of otolaryngology at Scripps Memorial Hospital La Jolla. (*Id.* at 141:15–19.) He is board certified in otolaryngology and regularly performs tonsillectomies. (*Id.* at 142:22, 143:2–7.)

61. Dr. Goldsztein stated that in tending to his patients post-tonsillectomy, he allows them to use a Yankauer tube. (*Id.* at 143:23–25.) He further stated that Yankauer tubes are regularly given to patients following operations. (*Id.* at 146:13–16.)

62. Dr. Goldsztein opined that he has never considered a Yankauer tube to pose life-threatening dangers to post-tonsillectomy patients, nor has he considered it as the potential cause of any injury. (*Id.* at 144:21–24.) He stated that he would not have had any objections to allowing Decedent to use a Yankauer tube after his tonsillectomy, and that it was not below the standard of care to do so. (*Id.* at 145:21–24, 149:22–25.)

63. Dr. Goldsztein further stated that it is speculative as to whether or not the Yankauer tube caused Decedent's bleeding. (*Id.* at 149:19–21.) In his experience, a Yankauer tube has never led to problems after tonsillectomies. (*Id.* at 147:3–4.)

11

64. The Court found Dr. Goldsztein's testimony and opinions credible and reasonably supported, as they were based on his experience and knowledge of the field. The Court also found that Dr. Goldsztein's opinions stayed consistent throughout direct and cross-examination.

iv.  Defendant's Expert: Dr. Resnikoff

65. Dr. Joseph Resnikoff is an attending physician and chief of pulmonary medicine at Scripps Mercy Hospital in San Diego. (Trial Transcript Day 5, T5 at 7:24, 8:4–5, Doc. 132.) He is board certified in internal medicine, pulmonary medicine, and critical care medicine. (*Id.* at 7:13–15.) Dr. Resnikoff reviewed the hospital notes, the autopsy report, expert witnesses' depositions and reports, and some literature review to prepare an opinion in this case. (*Id.* at 11:11–13.)

66. Dr. Resnikoff testified that he responds to Code Blues once or twice per month. (*Id.* at 10:9–15.) He stated that he has responded to well over one hundred Code Blues throughout his career. (*Id.* at 10:22–25.)

67. Dr. Resnikoff stated that a nurse is required to call a Code Blue when a patient loses his pulse, or when the patient stops breathing. (*Id.* at 15:4–7.) He further stated that generally, if a patient is bleeding but is still awake and has a pulse, it is not appropriate to call a Code Blue. (*Id.* at 15:14–18.)

68. In Dr. Resnikoff's opinion, the nurses responding to Decedent pressing his call light acted appropriately. (*Id.* at 52:1–10.) He testified that it is not reasonable to expect the nurses to call the Code Blue before Decedent's pulse became thready because they could not have foreseen the unusual, rapid deterioration of Decedent's condition. (*Id.*)

69. Dr. Resnikoff further testified that it was appropriate to use an Ambu bag to oxygenate Decedent, even though the Ambu bag was also pushing blood into Decedent's lungs. (*Id.* at 21:14–25, 22:1–9.) Dr. Resnikoff testified that it was necessary to keep using the Ambu bag "until you have an opportunity to pass an endotracheal tube or to get a surgical airway." (*Id.* at 22:17–20.)

70. Dr. Resnikoff testified that none of the hospitals he has worked at have had surgical airway equipment on crash carts. (*Id.* at 29:18–23.)  Dr. Resnikoff further testified that, based on his general knowledge of hospital sizes and layouts, retrieving surgical airway equipment from the operating room or ICU would take around five to ten minutes. (*Id.* at 32:19–25, 33:1–25, 34:1–2.)

71. Dr. Resnikoff stated that blind intubations are usually unsuccessful. (*Id.* at 48:20–22.)  He further testified that had a blind intubation been attempted for Decedent, it almost certainly would have failed because Decedent's airway was obstructed with blood, and because Decedent's throat's anatomy was altered from surgery. (*Id.* at 48:12–14, 23–25.)

72. Dr. Resnikoff testified that 25% of patients who enter cardiac arrest in hospitals in the United States survive to be discharged. (*Id.* at 50:10–13.)

73. The Court found much of Dr. Resnikoff's testimony to be supported by more generalized assumptions, as compared to the testimonies of Dr. Darwish and Dr. Mandoff.  For example, he opined that "being short of breath and bleeding does not . . . correspond to a code blue," without addressing the fact that Decedent was bleeding profusely from the mouth in a way that obstructed his airway. (*Id.* at 15:20–23.)  Further, when asked whether continuing to Ambu bag someone who was profusely bleeding from the mouth is appropriate, Dr. Resnikoff responded: "[G]enerally speaking you're not going to be able to oxygenate the patient sufficiently if you don't bag them." (*Id.* at 21:21–24.)  And finally, when testifying that it would take between five and ten minutes to retrieve a surgical airway kit from a different floor, Dr. Resnikoff's statements did not reflect that he had fully considered the emergency nature of the case at issue.  The Court therefore gives less weight to Dr. Resnikoff's opinions about the standard of care in calling a Code Blue for someone in Decedent's position, the standard of care in continuing to Ambu bag Decedent, and the time it would take to retrieve surgical airway equipment from a different floor in Decedent's case.

74. However, the Court found Dr. Resnikoff's testimony about the likelihood of success of the blind intubation to be reasonably supported. Dr. Resnikoff provided a detailed explanation about the process of performing a blind intubation and explained why, in Decedent's case, it would have likely failed. (*Id.* at 38–49.) The Court therefore credits Dr. Resnikoff's testimony about blind intubation.

### v. Dr. Wys's Testimony

75. The Court found credibility issues with Dr. Wys's testimony that undermine the weight of his assertion that he and the medical staff acted appropriately.

76. Specifically, when asked if the best way to proceed to ventilate Decedent was with an Ambu bag, Dr. Wys did not answer the question directly, instead stating "that's what was happening when I arrived. I did my best to support that." (T2 at 174:3–6.) He later maintained that he opted to continue Ambu bagging and administering CPR to Decedent for two minutes, without attempting to secure an airway, because "[y]ou want to continue the circulation." (*Id.* at 176:22–24.) Dr. Wys stated that focusing on circulation, through CPR and the Ambu bag, was more important than ensuring ventilation. (*Id.*) However, this testimony was inconsistent with his previous testimony that "[w]ithout ventilation, there's zero chance of survival," and that the Ambu bag did not appear to be working when he walked in. (*Id.* at 174:1–2.) Dr. Wys's testimony was also contradicted by Plaintiffs' experts Dr. Darwish, who stated that "even if there's no cardiac activity you still have . . . a short window of opportunity trying to achieve adequate oxygenation." (*Id.* at 35:19–21.) Further, Dr. Darwish, Dr. Mandoff, and Defendants' expert Dr. Resnikoff all opined that using an Ambu bag was appropriate only until proper ventilation could be achieved. (T2 at 36:2–6; T3 at 25:1–5; T5 at 22:17–20.) The Court therefore accords little weight to Dr. Wys's testimony that Ambu bagging Decedent and continuing CPR for at least two minutes, without attempting to secure an airway, was appropriate under the circumstances.

77. Additionally, when he was asked at what point during the Code Blue he asked for surgical airway equipment, Dr. Wys also opined that he "wouldn't know exactly." (T2 at 180:22–25.)  However, Dr. Wys then stated that he asked for surgical airway equipment at "basically the end," and that "[a]t the point we came to this point in the algorithm, he's had no cardiac activity for approximately 15 minutes, no good ventilation." (*Id.* at 181:5–10, 182:13–15.)  And Dr. Wys further conceded that he did not expect to need surgical airway equipment nor did he ask for it while using the Ambu bag. (*Id.* at 189:1–14.)  The Court found Dr. Wys's contradictory answers surrounding the timing of when he asked for the surgical airway equipment to undermine his credibility.

78. Dr. Wys stated that when he asked about surgical airway equipment, "[n]obody seem[ed] to have the opinion that it was readily available.  When I mean readily available, we're at less than five minutes." (*Id.* at 178:12–14.)  The Court does not credit Dr. Wys's testimony that the surgical airway equipment could not be retrieved within five minutes for several reasons, including because of issues with Dr. Wys's credibility as detailed above.  Moreover, Dr. Wys's testimony on this point was vague and did not state what he asked, what he was told, and what he assumed.  Further, Nurse Palacios testified that he did not hear any exchange regarding surgical airway equipment, undermining the notion that Dr. Wys was informed that it would take more than five minutes to retrieve the equipment. (T4 at 30:9–11.)

79. Dr. Wys further testified that he did not ask whether a surgical airway kit was available until "[t]he very bottom" of the ASA Algorithm for Difficult Airways because "you work your way through the algorithm . . . trying to maximize each step as you go." (T2 at 181:5, 189:10–15.)  The Court did not find this to be a persuasive explanation for Dr. Wys's failure to ask for a surgical airway kit sooner.  Both Dr. Darwish and Dr. Mandoff testified that the need for a surgical airway was apparent. (*Id.* at 29:5–19; T3 at 27:6–17.).  And Defendants' expert Dr. Resnikoff did not provide an opinion on whether the ASA Algorithm must

be followed in sequence such that a doctor would not be expected to request surgical airway equipment until the end.  (T5 at 26:10–25, 27:1–25, 28:1–3.) The Court therefore accords little weight to Dr. Wys's testimony that he acted appropriately despite failing to request surgical airway equipment at the outset of the Code Blue.

vi.   Nurse Abarca's Testimony

80. Nurse Arlene Abarca is an ICU Assistant Nurse Manager at the Hospital.  (T3 at 117:14, 118:21–22.)  She responded to the RRT and Code Blue, and was present in the room when Decedent passed away.  (*Id.* at 118:7–8, 123:6–9, 125:1–2.)

81. Nurse Abarca explained that it is "not a simple yes or no" and "dependent on the variables" as to whether to a nurse should call a Code Blue where a patient's heart has not stopped.  (*Id.* at 130:3–9.)

82. Nurse Abarca testified that if someone had a blocked airway such that they stopped breathing, that would be a sufficient reason to call a Code Blue.  (*Id.* at 131:1–4.)

83. The Court found Nurse Abarca's testimony to be credible.

**E. Impact to Decedent's Family**

84. Decedent had been married to Plaintiff Naomi Estrada-Mendoza for twenty-one years before his passing.  (Trial Transcript Day 1, T1 at 48:15–19, Doc. 128.) Decedent had one stepdaughter, Plaintiff Noel Estrada-Loud, and he and Naomi had two biological sons, Plaintiffs Juventino Mendoza and Ambrose Mendoza. (*Id.* at 50:1–15, 185:23–25, 186:1–3.)

85. Noel[2] is Decedent's stepdaughter; she was born in 1997.  (*Id.* at 48:7.)  She lived with Decedent and her mother, Naomi, until 2016.  (*Id.* at 205:20–22.)  Noel married Joshua Loud in 2017, and started living with her husband in 2018.  (*Id.* at 206:2–6.)  Noel testified that they were able to afford the necessities of life,

[2] The Court uses Decedent's family members' first names because their surnames are similar, and intends no disrespect.

16

and that Decedent was not supporting her financially during the two years before his death in 2021.  (*Id.* at 207:10–13, 208:4–6.)

86. Juventino, Decedent's biological son, was born in 2000.  (*Id.* at 48:9–10.)

87. Ambrose, Decedent's biological son, was born in 2004 and was 17 years old when Decedent passed away.  (*Id.* at 48:10–13.)  Ambrose moved away from his family home and to Northern California when he started college in 2022 or 2023.  (T2 at 108:12–14.)  He received Social Security benefit payments due to his father's death, in the total amount of $17,127.  (*Id.* at 110:23–25, 111:1–23.)

  i.  Economic Impact

88. Decedent suffered for over 10 years from chronic back pain.  (T1 at 98:11–13.)  Decedent would also occasionally have gout flare-ups, sciatica flare-ups, knee pain, shoulder pain, and limited ankle mobility.  (*Id.* at 98:21–25, 99:6–22, 101:2–7, 101:22–24.)  Decedent stopped working a construction job in 2010 due to back pain flare-ups, and did not look for a job after that.  (*Id.* at 102:4–15.)  At the time of his passing, Decedent was still experiencing some discomfort due to back pain.  (*Id.* at 124:8–14.)  Naomi, Decedent's wife, was a nurse and the primary breadwinner for the family.  (*Id.* at 103:14–16.)

89. Defendant's life expectancy expert Dr. Scott Kush works at the Life Expectancy Group, where he researches and studies life expectancy.  (T4 at 38:14–21.)  He graduated from Stanford Medical School and earned a degree in actuarial science from Columbia University.  (*Id.* at 38:5–10.)  Dr. Kush opined that Decedent's life expectancy at the time of his death was approximately 16.5 additional years, based on health factors such as obesity, diabetes, oropharyngeal squamous cell carcinoma, and other conditions.  (*Id.* at 57:20–25, 58:1–5.)  The Court found Dr. Kush's testimony to be credible and well-supported by his experience in the field and his review of Decedent's medical records.  Dr. Kush's testimony was unrebutted.

90. Defendant's expert Mr. Nicholas Buzas is an economic damages expert and senior vice president in the economic damages and valuations group at J.S.

Held.  (T3 at 81:17–23.)  Mr. Buzas testified that he reviewed the family's tax returns from 2017 to 2019, and 2021, but did not see any record of Decedent's earnings.  (*Id.* at 86:12–25.)  Mr. Buzas further testified that he reviewed medical records stating that Decedent was disabled and unemployed.  (*Id.* at 87:24–25.)  Mr. Buzas concluded that, because there is no record of Decedent working in the years preceding his death, it was not probable that Decedent had any future earning capacity.  (*Id.* at 88:3–25.)

91. Plaintiffs' expert Dr. Paul Thomas is a labor economist and vocational economic analyst with a PhD in Economics.  (T1 at 144:9–25.)  Using Dr. Kush's calculation that Decedent was expected to live 16.5 more years, Dr. Thomas calculated that Decedent's earning potential through the remainder of his life was $140,932.  (*Id.* at 150:2–15.)  Dr. Thomas based this calculation on the assumption the Decedent would earn a California minimum wage, and would have a work life expectancy that reflects that of an average male with a non-severe mobility disability.  (*Id.* at 151:1–18.)

92. The Court credits Mr. Buzas's testimony on the issue of Decedent's future earnings capacity over that of Dr. Thomas.  Dr. Thomas conceded on cross-examination that he did not review any documents showing any employment history for Decedent.  (*Id.* at 165:4–15.)  Moreover, Naomi's testimony shows that Decedent was experiencing continued health issues, and that Naomi had been the primary breadwinner for a number of years.  (*Id.* at 98:21–25, 99:6–22, 101:2–7, 101:22–24, 102:4–15, 103:14–16.)  The Court therefore finds that, at the time of his death, Decedent had no future earnings capacity.

93. Mr. Buzas further testified that he calculated the loss of household services, using the demographic tables specific to Decedent prior to his death and deducting Decedent's personal consumption of his own services.  (T3 at 90:6–25, 91:1–8.)  Mr. Buzas's calculation assumed that Plaintiffs would suffer the loss until Decedent's youngest child, Ambrose, turned 18.  (*Id.* at 93:20–25,

18

94:1–10.)  Mr. Buzas calculated the estimated loss of economic value of household services provided by Decedent to be $20,619.  (*Id.* at 97:4–10.)

94. By contrast, Dr. Thomas testified that the estimated loss of economic value of household services provided by Decedent is $72,900.  (T1 at 158:7–12.)  Dr. Thomas calculated this number by using the dollar value of the tasks the average male performs.  (*Id.* at 157:14–25, 158:1–2.)  Dr. Thomas's calculation assumed that Plaintiffs would suffer the loss of Decedent's services until Ambrose turned 22.  (*Id.* at 158:9–12.)

95. The Court credits Mr. Buzas's testimony on the issue of loss of household services over that of Dr. Thomas.  The Court found that Dr. Thomas, in including in his calculation the years until Ambrose turned 22 because 22 "is often considered the age of independence," ignored that Ambrose moved away from home and went to college when he was around 18.  (*Id.* at 158:9–12; T2 at 108:12–25, 109:1.)  Dr. Thomas further did not account for personal consumption.  (T1 at 177:3–9.)  The Court therefore concludes that the estimated loss of economic value of household services provided by Decedent is $20,619.

ii.  Non-Economic Impact

96. Juventino lived with his mother Naomi and Decedent all his life, until Decedent's passing.  (*Id.* at 130:6–14.)  Juventino described his father as troubled and strong, as his father came from a rough childhood and was putting in work to become a better father.  (*Id.* at 132:3–11.)  Juventino testified that his father worked with him when he was a kid, that he and his father saw movies together, and that his father supported him when he participated in sports.  (*Id.* at 132:13–16, 135:8–23.)  Juventino described conversations that he and his father would have where his father sought to give him advice.  (*Id.* at 136:9–23.)  Juventino stated that he loved his father, and that his father cared for and supported him.  (*Id.* at 132:19–22, 133:6, 135:22–25, 136:1–6.)  The Court found Juventino's testimony to be very credible.

97. When Decedent passed away, Ambrose had lived with his mother and Decedent his whole life.  (T2 at 89:2–8.)  Ambrose testified that he and his father spent a lot of time together when Ambrose was growing up, and that he and his father were very close.  (*Id.* at 89:25, 90:1–25.)  Ambrose testified that his father inspired several of his hobbies, such as comic books, video games, and sports.  (*Id.* at 91:20–25.)  He stated that he very much felt supported by his father growing up.  (*Id.* at 92:21–25, 93:1–8.)  Ambrose also stated that as he got older, he and his father were starting to enjoy more intellectual conversations.  (*Id.* at 89:21–24, 93:12–23.)  He further testified that without his father, he feels a void; for example, his father was one of the first people he wanted to call when he moved in to college.  (*Id.* at 99:5–16.)  The Court found Ambrose's testimony to be very credible.

98. Juventino's and Ambrose's mother, Naomi, further testified that Juventino and Ambrose, as young men, relied on Decedent for emotional support and advice.  (T1 at 59:9–21.)  She described Decedent as completely devoted to his children.  (*Id.* at 48:21–25.)  The Court found Naomi's testimony on this subject to be very credible.

## III. CONCLUSIONS OF LAW

99. Plaintiff brings this action pursuant to the Federal Tort Claims Act ("FTCA") for medical malpractice and wrongful death, alleging that Defendant negligently treated Decedent following his surgery, causing his death.  (Compl., Doc. 1-1; FPTC Order, Doc. 101.)

100. Under the FTCA, "district courts . . . have exclusive jurisdiction of civil actions or claims against the United States . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting in the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  Here, the doctors and nurses were employed by the Hospital, a government entity, and acting within the scope of their employment when they administered care to Decedent.

101.    A decedent's biological children have standing to bring a wrongful death

action for the death of the decedent.  Cal. Civ. Proc. Code § 377.60(a).  The

decedent's stepchildren will have standing to bring a wrongful death action for

the death of the decedent if they were dependent on the decedent.  *Id.*

§ 377.60(b).  "[D]ependence refers to financial support at the time of decedent's

death, or at most, two years before the decedent's death."  *Inzunza v. Naranjo*,

94 Cal. App. 5th 736, 747 (2023).

102.    To establish medical malpractice and wrongful death under California law,[3]

Plaintiffs must prove "(1) a duty to use such skill, prudence, and diligence as

other members of the profession commonly possess and exercise; (2) a breach of

the duty; (3) a proximate causal connection between the negligent conduct and

the injury; and (4) resulting loss or damage."  *Lattimore v. Dickey*, 239 Cal.

App. 4th 959, 968 (2015) (internal quotation marks and citation omitted).  To

recover for wrongful death, Plaintiffs must also establish, in addition to the

underlying negligent conduct, "the resulting death, and the damages, consisting

of the *pecuniary loss* suffered by the *heirs.*"  *Id.* (internal quotation marks and

citation omitted).

**A. Standing**

103.    Juventino and Ambrose, as Decedent's biological children, have standing to

bring this wrongful death action.  Cal. Civ. Proc. Code § 377.60(a).

104.    Noel is Decedent's stepchild.  As discussed in the Findings of Fact, Noel was

not financially dependent on Decedent at the time of his death nor in the years

preceding his death.  Thus, Noel does not have standing to bring a wrongful

death action.  *Inzunza*, 94 Cal. App. 5th at 747; *Chavez v. Carpenter*, 91 Cal.

App. 4th 1433, 1445 (2001) ("For the purposes of this subdivision, dependence

refers to financial support. . . .  The term 'dependent' would be rendered

---

[3] Because the incident occurred in California, California law governs Plaintiff's claim.  *Molzof
v. United States*, 502 U.S. 301, 305 (1992).

1    virtually meaningless if emotional dependency was sufficient to sue for

2    wrongful death." (internal quotation marks and citation omitted)).

3    **B. Duty and Breach of Duty**

4    105.   The Court concludes—and Defendant does not dispute—that the doctors and

5        nurses owed Decedent a duty "to use such skill, prudence, and diligence as other

6        members of the profession commonly possess and exercise." *Lattimore*, 239

7        Cal. App. 4th at 968 (internal quotation marks and citation omitted).

8    106.   A medical provider has breached their duty when they fail to "use the

9        learning, care and skill normally possessed and exercised by practitioners of that

10       specialty under the same or similar circumstances." *Id.*  Plaintiffs must establish

11       "some deviation by the [medical provider] from the standard of care that his

12       peers consider appropriate in the situation under review[.]" *Burgess v. Superior*

13       *Ct.*, 2 Cal. 4th 1064, 1081 (1992) (internal quotation marks and citation

14       omitted).  "[A] nurse's conduct must not be measured by the standard of care

15       required of a physician or surgeon, but by that of other nurses in the same or

16       similar locality and under similar circumstances." *Lattimore*, 239 Cal. App. 4th

17       at 969 (internal quotation marks and citation omitted).[4]

18                        i.   Providing the Yankauer Tube

19   107.   Plaintiffs have not established by a preponderance of the evidence that by

20       providing Decedent with a Yankauer tube following his surgery, Dr. Filho

21       breached a duty owed to Decedent.

22   108.   As discussed in the Findings of Fact, Dr. Goldsztein credibly testified that

23       providing patients with a Yankauer tube is common and meets the standard of

24       care after tonsillectomies.  (T3 at 145:21–24, 149:22–25.)  The Court credits

25       Dr. Goldsztein's testimony over that of Dr. Mandoff on this subject, as

---

[4] Plaintiffs contend that the doctrine of res ipsa loquitor applies here.  However, this is not a case "when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.'" *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 1001 (1994) (citation omitted).  Res ipsa loquitor does not apply.

Dr. Goldzstein testified that he has experience tending to patients post-tonsillectomy, while Dr. Mandoff testified that he is not typically in the position to advise patients or nurses about suction devices post-tonsillectomy. (*Id.* at 56:11–18, 143:23–25.)

109.    Plaintiffs' expert Dr. Darwish offered no opinion on whether providing a Yankauer tube fell below the standard of care. (T2 at 53:11–15.)

110.    Thus, the evidence shows that Dr. Filho met the applicable standard of care in providing a Yankauer tube to Decedent.

ii.    <u>Failure to Promptly Call a Code Blue</u>

111.    The nurses responded to Decedent's call button at around 4:55 a.m., and they called the Code Blue at around 5:01 a.m. (T4 at 16:2–11, 23:17–25, 24:1–10; Admitted Fact at 4; T3 at 133:24–25, 134:1–5.) The Court concludes that the nurses' failure to immediately call a Code Blue fell below the applicable standard of care.

112.    As discussed at length in the Findings of Fact, both Dr. Darwish and Dr. Mandoff highlighted that Decedent was profusely bleeding from his mouth, such that Dr. Mandoff characterized the situation as a "dire emergency." (T2 at 19:19–23; T3 at 18:17–20.) They both testified that a Code Blue should have been immediately called in such a situation. (T2 at 19:25, 20:1–25, 21:1–22, 28:5–10; T3 at 18:17–20.) Dr. Darwish further explained that because the nurse who responded to Decedent's call button was a resource nurse, who is typically more experienced and knowledgeable than other nurses, she should have known that Decedent was facing a medical emergency which required calling a Code Blue. (T2 at 18:7–9.) Although Dr. Resnikoff testified generally that "being short of breath and bleeding does not . . . correspond to a code blue," (T5 at 15:20–23), as the Court explained in its Findings of Fact, it accords little weight to Dr. Resnikoff's testimony on this subject. Moreover, Dr. Resnikoff's testimony was contradicted by Nurse Abarca's testimony, which was more specific to the instant case, that if someone had a blocked airway such that they

23

could not breathe, that would be a sufficient reason to call a Code Blue. (T3 at
131:1–4.) The Court therefore concludes that the standard of care for similarly
situated nurses in similar circumstances would be to immediately call a Code
Blue.

113.    The evidence therefore establishes that the nurses' failure to immediately call
a Code Blue upon witnessing Decedent's condition fell below the standard of
care.

iii.    Continuing to Ambu Bag Without Attempting a Surgical Airway

114.    The Court concludes that Dr. Wys's decision during the Code Blue to
continue administering CPR and the Ambu bag to Decedent, without attempting
to secure a surgical airway, fell below the applicable standard of care.

115.    There was substantial resistance every time the staff squeezed the Ambu bag
due to the blood in Decedent's throat. (T4 at 28:1–7.) Dr. Mandoff testified that
it should have been obvious that the Ambu bag was not working after a few
breaths, so continuing to Ambu bag fell below the standard of care because it
was taking time away from successfully securing an airway. (T3 at 24:1–22,
25:1–5.) Even Dr. Wys acknowledged that the Ambu bag did not appear to be
working at the outset of the Code Blue. (T2 at 172:10–14, 175:8–12.) As
explained above, the Court does not credit Dr. Wys's testimony that continuing
to Ambu bag and administer CPR nonetheless was an appropriate choice under
the circumstances.

116.    Dr. Darwish testified that an airway needed to be secured, and Dr. Mandoff
also testified that, if intubation was not an option, a surgical airway was needed
for Decedent. (T2 at 34:7–10; T3 at 27:14–17.) Dr. Resnikoff's testimony also
recognized the need "to pass an endotracheal tube or to get a surgical airway."
(T5 at 22:17–20.) Dr. Wys further acknowledged that, at a certain point, he did
realize the need for a surgical airway. (T2 at 178:9–14.)

117.    However, Dr. Wys's testimony shows that he asked for the equipment only
near the end of the Code Blue, around 17 minutes after he arrived. (*Id.* at

178:23–25, 179:1–2, 180:22–25, 181:1–10, 204:23–25, 205:1–9.)  Dr. Darwish stated that during the Code Blue, the medical staff needed to act quickly, and Dr. Mandoff testified that the situation was a dire emergency for which the medical staff should have focused on securing an airway, rather than Ambu bagging Decedent.  (T2 at 70:1–25; T3 at 24:16–22, 25:1–5.)  As the Court explained in its Findings of Fact, it does not credit Dr. Wys's explanation for his delay in asking for surgical airway equipment.  Thus, the Court concludes that Dr. Wys's delay in attempting to secure a surgical airway fell below the applicable standard of care.[5]

118.    Plaintiffs have established that the medical staff breached their duty of care in treating Decedent.  Specifically, the nurses' failure to immediately call a Code Blue, and Dr. Wys's failure to promptly seek to perform a surgical airway, fell below the applicable standards of care.

**C. Causation**

119.    "Plaintiff must prove by a preponderance of the evidence a causal connection between [Defendant's] negligence and [Decedent's] injuries."  *Pedroza v. United States*, 2021 WL 4441974, at *5 (C.D. Cal. Sept. 27, 2021) (citing *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1052 (1991), and *Skinner v. Vacaville Unified Sch. Dist.*, 37 Cal. App. 4th 31, 42 (1995)).

120.    "Causation is established for purposes of California tort law if the defendant's conduct is a substantial factor in bringing about the plaintiff's

---

[5] Plaintiffs additionally contend that Dr. Wys's failure to attempt a blind intubation fell below the standard of care.  However, Plaintiffs have not met their burden to establish that a blind intubation would have improved Decedent's chances of survival.  Both Dr. Darwish and Dr. Mandoff recognized that performing a blind intubation would have been difficult, and Dr. Resnikoff persuasively testified that in this case, a blind intubation almost certainly would have failed.  (T2 at 36:22–25, 39:1–6; T3 at 27:3; T5 at 48:12–14, 23–25.)  Although the Court credits Dr. Darwish's and Dr. Mandoff's testimony and concludes that the failure to perform a blind intubation fell below the standard of care, Plaintiffs have not established that Dr. Wys's negligence in failing to perform a blind intubation caused his death to a reasonable medical probability, so the Court's findings do not rely on the failure to perform a blind intubation.

injury." *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal. 5th
216, 223 (2018), *as modified* (July 25, 2018) (internal quotation marks omitted).

121.    "In a medical malpractice action, the evidence must be sufficient to allow the
[factfinder] to infer than in the absence of the defendant's negligence, there was
a reasonable medical probability the [Decedent] would have obtained a better
result." *Alef v. Alta Bates Hosp.*, 5 Cal. App. 4th 208, 216 (1992).  "A possible
cause only becomes 'probable' when, in the absence of other reasonable causal
explanations, it becomes more likely than not that the injury was a result of its
action." *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 403 (Ct. App.
1985); *see Bromme v. Pavitt*, 5 Cal. App. 4th 1487, 1498 (1992).

i.   <u>Pain and Suffering</u>

122.    The Court concludes that the medical staff's negligence was not a substantial
factor in causing Plaintiff's pain and suffering.

123.    Naomi, as representative of Decedent's estate, may recover for the pain and
suffering Decedent experienced while conscious.  Cal. Civ. Proc. Code
§ 377.34(b); *see Sokmen v. United States*, 2023 WL 4672376, at *3 (C.D. Cal.
July 20, 2023) ("[C]ourts in this and other jurisdictions generally hold that there
must be 'some level of awareness' for a plaintiff to recover for pain and
suffering.").  To establish causation, Plaintiffs must prove that the medical
staff's failure to promptly call a Code Blue and failure to attempt to secure a
surgical airway was a substantial factor in bringing about Decedent's conscious
pain and suffering.

124.    The nurses responded to Decedent's call button at around 4:55 a.m., and
Decedent lost consciousness at or before 5:03 a.m.  (Admitted Fact at 4–5.)
Plaintiffs can therefore recover only for the pain and suffering Decedent
experienced within this time window.

125.    However, none of Plaintiffs' experts provided an opinion as to whether
prompt responses by the medical team could have successfully secured an
airway and alleviated Decedent's suffering within this time window.  Thus,

Plaintiffs have failed to establish that the medical team's failure to promptly take action contributed to Decedent consciously experiencing pain and suffering.

### ii.  Death

126.   The Court concludes that the medical staff's negligence was a substantial factor in causing Decedent's death.

127.   As discussed above, under the applicable standard of care, a Code Blue would have immediately been called, and Dr. Wys would have promptly prepared to perform a surgical airway at the outset of the Code Blue, including by asking for a surgical airway kit.

128.   Although no surgical airway equipment was available at Decedent's bedside during the Code Blue, the evidence shows that it could have promptly been secured had the standard of care been met.  As discussed, the Court does not credit Dr. Wys's testimony that no surgical airway kit could be retrieved within five minutes, and it accords little weight to Dr. Resnikoff's testimony that acquiring a surgical airway kit would have taken around five to ten minutes.

129.   Rather, based on Dr. Darwish's and Dr. Mandoff's testimony, the Court concludes that had the applicable standard of care been met, a surgical airway kit would have been within reach and could have been procured promptly.  (T2 at 33:8–25; T3 at 33:13–20, 34:3–7.)  Thus, had the standard of care been met, the medical staff would have been prepared to perform a surgical airway within minutes of Decedent hitting his call button.

130.   The evidence shows that, had a surgical airway been promptly performed in line with the standard of care, there is a reasonable medical probability that Decedent would have survived.  Dr. Darwish testified that, if the standard of care had been met from the moment Decedent had hit his call button, he "more likely than not" would have survived.  (T2 at 41:16–19.)  Dr. Darwish explained that he would assume that Decedent would recover, because Decedent was 45 years old with a healthy heart.  (*Id.* at 73:1–8.)  Dr. Mandoff stated that, for similar reasons, with the proper equipment on hand, Decedent's chance of

27

survival would have been very good.  (T3 at 35:16–23.)  Although Dr. Resnikoff testified that "[i]n the United States, the survival for a cardiac arrest . . . to hospital discharge is 25 percent," (T5 at 50:10–13), the Court accords little weight to this testimony, as it cites to a generalized statistic and does not assess the specific circumstances relevant to Decedent.

131.    Thus, the evidence shows that, had the standard of care been met, there is a reasonable medical probability that Decedent would have survived.

**D. Damages**

132.    The personal representative of a decedent's estate may recover damages for the decedent's pain and suffering.  Cal. Civ. Proc. Code § 377.34(b).

133.    However, as discussed above, Naomi, as representative of Decedent's estate, cannot recover for Decedent's pain and suffering because Plaintiffs have failed to demonstrate that Decedent's pain and suffering was caused by medical negligence.

134.    Those Plaintiffs with standing to bring wrongful death actions can recover economic and non-economic damages to compensate for the death of the decedent.  Model Jury Instruction by the Judicial Council of California Civil Jury Instructions 3921 ("CACI 3921"); *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 795–96 (2010).

135.    As discussed above, Noel does not have standing to bring a wrongful death action, and therefore cannot recover damages.

136.    Juventino and Ambrose do have standing and can recover economic and non-economic damages.

i.   Economic Damages

137.    Economic damages include the financial support the decedent would have provided, the loss of gifts or benefits from the decedent, funeral and burial expenses, and the reasonable value of household services the decedent would have provided.  CACI 3921.  Here, Plaintiffs seek to recover damages for

Decedent's lost future earnings and loss of the value of household services he would have provided.

138.    As explained in detail in its Findings of Fact, the Court concludes that there are no lost earnings resulting from Decedent's death and the loss of value of household services is $20,619.

### ii.    Non-Economic Damages

139.    California recognizes "the right of wrongful death plaintiffs to recover noneconomic damages, including damages for loss of society and comfort[.]" *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 795 (2010).  "California permits recovery in a child's wrongful death action for loss of a parent's consortium." *Boeken v. Philip Morris USA Inc.*, 217 Cal. App. 4th 992, 997–98 (2013).  "Factors such as the closeness of a family unit, the depth of their love and affection, and the character of the decedent as kind, attentive, and loving are proper considerations[.]" *Soto v. BorgWarner Morse TEC Inc.*, 239 Cal. App. 4th 165, 201 (2015), *as modified* (Aug. 20, 2015).  Damages for grief and sorrow, however, are not recoverable.  *Krouse v. Graham*, 19 Cal. 3d 59, 69 (1977).

140.    California's Medical Injury Compensation Reform Act ("MICRA") limits the losses plaintiffs can recover in actions for medical negligence.  Until December 31, 2022, MICRA provided that "[i]n any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses . . . .  In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."  Cal. Civ. Code § 3333.2 (amended January 1, 2023).  The MICRA damages cap applies to wrongful death actions.  *Yates v. Pollock*, 194 Cal. App. 3d 195, 199 (Ct. App. 1987).  Under MICRA, "while each injured plaintiff is entitled to seek noneconomic damages, the maximum recovery permitted in any single medical malpractice *action* is $250,000, regardless of the number of plaintiffs involved."  *Id.* at 200 (emphasis in original).

141.    However, MICRA was amended to apply higher damages caps to "all cases filed or arbitrations demanded on or after, January 1, 2023." Cal. Civ. Code § 3333.2(g) (effective January 1, 2023). For those actions, if they are brought for wrongful death, noneconomic damages "shall not exceed five hundred thousand dollars ($500,000)[.]" *Id.* § 3333.2(c).

142.    This action was filed in San Bernardino County Superior Court on May 23, 2022. (Compl.) The higher 2023 MICRA damages cap therefore does not apply.[6]

143.    Plaintiffs contend that the 2023 MICRA damages cap should apply because of the doctrine of estoppel. (Pltf. FOFCOL at 29–31.) Under the doctrine of estoppel, "[w]henever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 488–89 (1970). "A party seeking to raise estoppel against the government must establish 'affirmative misconduct going beyond mere negligence.'" *Wagner v. Dir., Fed. Emergency Mgmt. Agency*, 847 F.2d 515, 519 (9th Cir. 1988) (citation omitted).

144.    Estoppel does not apply. Plaintiffs contend that Defendant's removal of this action to federal court was "done to manufacture this legally questionable argument," and that Defendant's "stipulation that included a reference to Defendant USA accepting liability for all doctors and nurses" was done "to claim that the case against Defendant U.S.A. was somehow brought against it in 2022[.]" (Pltf. FOFCOL at 30–31.) However, the Westfall Act permits the

---

[6] Plaintiffs contend that because they filed a separate, related action against the United States in 2023, the higher 2023 MICRA damages cap should apply. (Pltf. FOFCOL at 29.) To the extent this argument is separate from their estoppel argument, it is unavailing. Plaintiffs do not provide any caselaw nor statutory authority to show why the date of filing of the related action is relevant. Again, because this action was filed in 2022, the Court concludes that the pre-2023 MICRA cap plainly applies under the statute.

30

United States to "defend any civil action . . . brought in any court against any employee of the Government[]."  28 U.S.C. § 2679(c).  Because Defendant's actions amount to no more than routine procedural measures taken in line with the Westfall Act, Plaintiffs fall far short of establishing any affirmative misconduct on the part of Defendant.

145.    Thus, the Court concludes that the 2022 MICRA cap on non-economic damages applies.  Plaintiffs in this action may recover a maximum of $250,000 in noneconomic damages in total.

146.    As discussed above, Juventino lived with his father his whole life until his father's passing.  (T1 at 130:6–14.)  Juventino and his father enjoyed many activities together, like going to the movies, and his father would support Juventino when he played sports.  (*Id.* at 132:13–16, 135:8–23.)  Juventino stated that his father gave him much advice and support, and that he loved his father and his father cared for him.  (*Id.* at 132:19–22, 133:6, 135:22–25, 136:1–6–23.)

147.    The Court concludes that value of Decedent's companionship to Juventino was very high, and awards Juventino $125,000 in damages to compensate for the loss of Decedent's society and comfort.

148.    As discussed above, Ambrose lived with his father his whole life until his father's passing.  (T2 at 89:2–8.)  Ambrose and his father were very close, and his father inspired several of his hobbies.  (*Id.* at 89:25, 90:1–25.)  Ambrose stated that he felt supported by his father, and that he and his father were starting to have more intellectual conversations.  (*Id.* at 92:21–25, 93:1–23.)

149.    The Court concludes that the value of Decedent's companionship to Ambrose was very high, and awards Ambrose $125,000 in damages to compensate for the loss of Decedent's society and comfort.

iii.    Damages Offset

150.    Defendant argues that it is entitled to a damages offset because of the "$17,127 it paid to Ambrose Mendoza in the 2021–22 Social Security payments

he received due to his father's death."  (Def. FOFCOL at 20.)  However, "[a]mounts of recover in wrongful death actions have not been reduced by receipt of social security benefits."  *In re Jameson's Est.*, 224 Cal. App. 2d 517, 520 (Ct. App. 1964); *United States v. Harue Hayashi*, 282 F.2d 599, 603–04 (9th Cir. 1960).  Defendant is not entitled to an offset for the social security payments it made to Ambrose.

## IV.    **CONCLUSION**

For the above reasons, the Court concludes that Juventino Mendoza is entitled to damages against Defendant United States, in the amount of $10,309.50 in economic damages and $125,000 in non-economic damages, for a total of $135,309.50.  Ambrose Mendoza is entitled to damages against Defendant United States, in the amount of $10,309.50 in economic damages and $125,000 in non-economic damages, for a total of $135,309.50.  The Court ORDERS Plaintiffs to prepare and submit a Proposed Judgment consistent with this Order.  The Proposed Judgment shall be submitted within **seven (7) days** of the issuance of this Order.

DATED:  February 17, 2026

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE